**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

MARVIN PACE,

Plaintiff,

v. Case No. 3:23-cv-965-WWB-SJH

JESSICA PUTNEY, et al.,

Defendants.
_______________________________/

# ORDER

THIS CAUSE is before the Court on Defendants' Amended Motion for Summary Judgment ("**Motion**," Doc. 194), Plaintiff's Response in Opposition ("**Response**," Doc. 216),[1] Defendants' Reply (Doc. 219), and Plaintiff's Sur-reply (Doc. 223). For the reasons set forth below, Defendants' Motion will be denied as stated herein.

## I. PROCEDURAL HISTORY

Plaintiff Marvin Rakim Pace ("**Plaintiff**" or "**Pace**"), an inmate of the Florida Department of Corrections ("**FDOC**"), is proceeding pro se and in forma pauperis on a Civil Rights Complaint ("**Complaint**"), alleging claims of deliberate indifference to his left-eye injury under the Eighth Amendment and medical negligence under Florida law. (Doc. 1). Through his Complaint and supporting exhibits, Plaintiff alleges that on March 3, 2022,

[1] To the extent Plaintiff requests affirmative relief in his Response, (*see* Doc. 216 at 38–39 n.2 & n.4), his requests are denied as improper. *See* Fed. R. Civ. P. 7(b) ("A request for a court order must be made by motion."); M.D. Fla. R. 3.01(b) (providing that a motion must be supported by a memorandum of law) & 3.01(g) (providing that before filing most motions, a party must confer with the opposing parties in a good faith effort to resolve the motion).

he "sustained significant physical injuries after being brutally attacked twice in one day by prison guards" at Union Correctional Institution ("**Union C.I.**"). (*Id.* at 8). As a result, "Plaintiff immediately lost vision in his left eye[,] instantly within seconds[,] after repeatedly being punched countless time[s] in the left eye by officials['] closed fist[s], inflicting wanton agonizing pain, and suffering." (*Id.*). Following this incident, Plaintiff alleges officials at both Union C.I. and Suwannee Correctional Institution ("**Suwannee C.I.**") were negligent and deliberately indifferent to his serious medical need, causing him to suffer: (1) left-eye vision loss, agonizing pain, and extreme sensitivity to light; (2) emotional distress; and (3) psychological distress and fear of permanent blindness. (*Id.* at 27–36). Plaintiff seeks compensatory and punitive damages, among other forms of relief. (*Id.* at 36–38).

Plaintiff named thirteen Defendants in his Complaint: (1) Centurion of Florida, LLC ("**Centurion**"); (2) Statewide Medical Doctor John Lay ("**Dr. Lay**"); (3) Regional Medical Director Alvia I. Varona ("**Dr. Varona**"); (4) Chief Health Officer Asbelti Llorens ("**Dr. Llorens**"); (5) Chief Health Officer Alexis Figueroa ("**Figueroa**"); (6) Optometrist Dortheanne Roberts ("**Dr. Roberts**"); (7) Director of Nursing David Noles, R.N. ("**Nurse Noles**"); (8) John McGraw, LPN ("**Nurse McGraw**"); (9) Assistant Secretary for Health Services Michelle Schouest ("**Schouest**"); (10) Secretary Representative for Medical Appeals J. Bowden ("**Bowden**"); (11) Nurse Practitioner Jessica Putney ("**Nurse Putney**"); (12) Nurse Practitioner Arturo Miranda ("**Nurse Miranda**"); and (13) Gloria Walden, LPN ("**Nurse Walden**"). (*See generally id.*). The Court previously dismissed ten of the named Defendants. (*See* Doc. Nos. 106, 136).

The three remaining Defendants—Nurse Walden, Nurse Putney, and Nurse Miranda[2]—move for summary judgment, arguing that there are no genuine issues of material fact concerning Plaintiff's deliberate indifference claims, and that Plaintiff has failed to proffer medical expert testimony to support his medical negligence claims. (Doc. Nos. 194, 219). Plaintiff responds that Defendants' Motion should be denied, because: (1) genuine issues of material fact exist concerning his deliberate indifference claims; and (2) Defendants have waived the requirement of submitting a medical expert opinion. (Doc. Nos. 216, 223).

## II. LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.* "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007). Stated differently, the moving party discharges its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

---

[2] During the events described in the Complaint, Nurse Walden and Nurse Putney were employed at Union C.I., while Nurse Miranda was employed at Suwannee C.I.

However, once the moving party has discharged its burden, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by [his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotation omitted). The nonmoving party may not rely solely on "conclusory allegations without specific supporting facts." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). Nevertheless, "[i]f there is a conflict between the parties' allegations or evidence, the [nonmoving] party's evidence is presumed to be true[,] and all reasonable inferences must be drawn in the [nonmoving] party's favor." *Allen*, 495 F.3d at 1314. Additionally, a court should accept as true a pro se plaintiff's assertions in his verified complaint and affidavit attached to his response. *See Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019).

"If a party . . . fails to properly address another party's assertion of fact . . . [,] the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). However, "the district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion." *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004). "At the least, the district court must review all of the evidentiary materials submitted in support of the motion for summary judgment," and "must ensure that the motion itself is supported by evidentiary materials." *Id.* at 1101–02. However, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments." *See Resolution Tr. Corp. v.*

*Dunmar*, 43 F.3d 587, 599 (11th Cir. 1995) (citation omitted). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III. PLAINTIFF'S ALLEGATIONS AND PERTINENT MEDICAL RECORDS

### A. Union C.I.

After a use-of-force incident on March 3, 2022, Nurse Walden noted that Plaintiff had a busted lip and blood on his spit shield but was unable to complete the examination due to Plaintiff's behavior. (Doc. 194-2 at 1; Doc. 194-3 at 1; Doc. 194-4 at 1; Doc. 216-1 at 37–38). Nurse Putney signed off on Nurse Walden's evaluation and noted that Plaintiff refused medical services. (Doc. 194-3 at 2; Doc. 194-5; Doc. 216-1 at 39, 49). Plaintiff alleges that at that time, Nurse Walden "became personally aware and conscious" of his physical injuries, including his swollen left eye and his verbal complaints of vision loss with agonizing pain, but she intentionally failed to document his injuries or send Plaintiff to a physician. (Doc. 1 at 8).

After a second use-of-force incident that same day, Nurse Noles evaluated Plaintiff, observing a "noted contusion" on his left upper orbit without discoloration. (Doc. 194-6 at 1). Plaintiff alleges he informed Nurse Noles of the agonizing pain and vision loss in his left eye and that he requested to be seen by a doctor and receive pain relief. (Doc. 1 at 9). Nurse Noles allegedly advised that he would monitor Plaintiff's left eye, which looked "pretty bad," but that he could not give anything for the pain. (*Id.* at 10).

The medical record reflects that Nurse Noles administered eye wash and recommended cool compresses. (Doc. 194-6 at 1).

Plaintiff alleges that on March 4, 2022, at approximately 2:40–2:50 p.m., he alerted Nurse McGraw of a self-declared medical emergency for his agonizing left-eye pain, rated at 10 out of 10, with vision loss, after the blunt-force trauma from the previous day. (Doc. 1 at 10–11). Plaintiff claims his left eye was "shut closed, extremely swollen, discolored[,] [and] sensitive to touch and light[]." (*Id.* at 11). Although there is no medical record of a March 4, 2022 encounter, Plaintiff alleges Nurse McGraw acknowledged that Plaintiff's eye looked "pretty bad," but said he would "be alright," and determined it was not a medical emergency, despite being "extremely worse" than the day before. (*Id.*).

On March 5, 2022, Nurse Young escorted Plaintiff to the nurses' station where he was examined by Nurse Noles pursuant to a sick-call request. (*Id.* at 12; Doc. 194-7 at 1). In the sick-call request, Plaintiff wrote:

> [B]lunt force[] trauma [to the] left eye, immediate los[s] of vision, blood clots inside [the] left eye, swelling [with] black ring on the outside [and] unbearable pain; . . . .
> My left eye is worse[;] it is starting to close now. . . . Left eye hurt[s] extremely bad, I cannot see nothing at all, lost vision.

(Doc. 194-7 at 1, 3). Upon examination, Plaintiff's left eye was swollen/bruised with red cornea. (Doc. 194-8 at 1). Nurse Noles administered eye wash, advised he would continue to monitor it, and instructed Plaintiff to return to the clinic, if necessary. (Doc. 194-7 at 1). According to Plaintiff, Nurse Noles said he might need to send Plaintiff to a doctor if his left eye did not improve, but that he thought it would be cost-prohibitive. (Doc. 1 at 12–13).

On March 27, 2022, Plaintiff submitted a sick-call request complaining of multiple issues, including instant loss of vision in his left eye with unbearable pain rated at 10, as well as sensitivity to light and touch. (Doc. 216-1 at 14, 16). His sick-call issues were addressed on March 31, 2022. (*Id.* at 12).

Plaintiff alleges that on March 28, 2022, Nurse Putney saw him for a follow-up unrelated to his eye, refused to examine his eye at that time, and stated that all she could do was refer Plaintiff to an optometrist in response to his complaints of vision loss. (Doc. 1 at 17–18).

On March 31, 2022, while Nurse Putney was evaluating Plaintiff for a medical emergency, she submitted an order for an optometrist consultation to evaluate Plaintiff's vision changes after an altercation.[3] (Doc. 194-20 at 1; Doc. 194-21; Doc. 194-22 at 5–6; Doc. 194-23; Doc. 216-1 at 7, 9). Nurse Putney noted that Plaintiff's pupils were "equally reactive to light and accommodation" and his extraocular muscles were "intact bilaterally." (Doc. 194-22 at 3).

On April 6, 2022, Plaintiff had a neurology appointment with Dr. Bashar Mohsen ("**Dr. Mohsen**"). (Doc. 194-24). Plaintiff complained of vision loss in his left eye, among several other issues. (*Id.* at 1). Dr. Mohsen diagnosed Plaintiff with multiple sclerosis ("**MS**"), syncope, and neuromyelitis optica.[4] (*Id.* at 1–3). Dr. Mohsen recommended

[3] Plaintiff alleges he inquired about the status of his annual optometrist appointment with Dr. Roberts, whose last examination of Plaintiff took place on April 26, 2021. (Doc. 1 at 18–19; Doc. 1-4).

[4] Neuromyelitis optica, also known as neuromyelitis optica spectrum disorder or Devic disease, is a central nervous system disorder that causes inflammation in nerves of the eye and the spinal cord. The condition may appear after an infection or it can be linked with another autoimmune condition. Although it is often misdiagnosed as MS, or is seen as a type of MS, it is a different condition. Neuromyelitis optica can cause blindness, weakness in the legs or arms, and painful spasms. It can also cause loss of

various tests, including neuromyelitis optica antibody testing; a prescription for Gabapentin; and a follow-up appointment in two weeks. (*Id.* at 3).

On April 10, 2022, Plaintiff declared another medical emergency, complaining, inter alia, that his vision was getting worse. (Doc. 194-26). Nurse Lucinda O'Connor ("**Nurse O'Connor**") determined it was not a medical emergency, informed Plaintiff of his upcoming appointments, and allowed him "to vent and verbalize his frustrations." (*Id.*).

On April 20 and 21, 2022, Plaintiff alleges Nurse Walden intentionally blocked his access to eye care because of his grievances, ignored his self-declared medical emergency, and maliciously threw away some of his sick-call requests. (Doc. 1 at 13–14).

On April 28, 2022, Nurse Putney saw Plaintiff for vision changes and other complaints and submitted an order for an optometrist consultation. (*See* Doc. 194-38 at 4; Doc. 216-1 at 87). She also started Plaintiff on Effexor for nerve pain and noted she was awaiting Dr. Lay's decision about Plaintiff's pain medications. (Doc. 194-39; Doc. 216-1 at 99). Plaintiff claims he never received Effexor and was not given any pain medication. (*See* Doc. 1 at 17–18; Doc. 216-1 at 92–93). The same day, Plaintiff declared a medical emergency because he needed to see a doctor who could write prescriptions and wanted to know what was going on with his eye appointment. (Doc. 194-40). Nurse O'Connor advised that a prescription had been submitted to the pharmacy, and that an eye consult was pending. (*Id.*).

---

sensation, vomiting, hiccups, and bladder or bowel symptoms. Neuromyelitis optica can cause permanent vision loss and trouble walking. *See* Mayo Clinic: Diseases & Conditions: Neuromyelitis optica, https://www.mayoclinic.org/diseases-conditions/neuromyelitis-optica/symptoms-causes/syc-20375652 (last visited June 24, 2026).

On May 6, 2022, Nurse Putney discussed Plaintiff's pain management with Dr. Lay, ordered Meloxicam (also known as Mobic), and noted that a follow-up was scheduled. (Doc. 194-51).

On June 1, 2022, Dr. Mohsen diagnosed Plaintiff with syncope, neuromyelitis optica, MS, and paraplegia; ordered diagnostic tests and medications; and recommended follow-up in one month. (Doc. Nos. 194-77, 194-86).

On June 2, 2022, Nurse Putney instructed Plaintiff to continue with Meloxicam and submitted orders for diagnostic tests and a neurology follow-up. (Doc. Nos. 194-87, 194-88).

On June 6, 2022, Nurse Putney informed Dr. Llorens that Plaintiff was complaining of pain and demanding pain medications. (Doc. 216-2 at 9). Dr. Llorens saw Plaintiff for chronic pain, noted Plaintiff's allergies to NSAIDs and APAP Lortab,[5] explained the risks versus the benefits of available medications considering these allergies, and ordered Effexor and a mental health evaluation for a multidisciplinary approach to Plaintiff's chronic pain, even though Plaintiff was "willing to take any medication regardless [of] the risk of an allergic reaction." (Doc. 194-73; Doc. 194-91 at 4, 6).

On June 9, 2022, Nurse Putney saw Plaintiff after his neurology consultation, noted vision changes, and referred Plaintiff to optometry. (Doc. Nos. 194-95, 194-96).

On June 30, 2022, Nurse Putney saw Plaintiff for multiple issues, including a pending optometry consultation. (Doc. 194-105 at 1, 3). The same day, Nurse Walden addressed Plaintiff's June 22, 2022 sick-call requests, at which Plaintiff complained of

[5] The record reflects that Plaintiff was allergic to NSAIDs like Motrin/Ibuprofen, Tylenol/Acetaminophen, and APAP Lortab, among other medications. (*See, e.g.*, Doc. 194-73; Doc. 194-91 at 4; Doc. 194-116 at 1).

unbearable pain in the left eye with loss of vision since March 3, 2022. (Doc. 194-106 at 2, 4, 7). Plaintiff asserts his issues were not being addressed by the proper medical professionals. (*Id.* at 7).

On July 12, 2022, Plaintiff voiced concerns about needing glasses, and he was advised that an optometrist consultation was pending. (Doc. 194-107; Doc. 194-108 at 2–3). On July 18, 2022, Plaintiff complained of being without glasses for over a year and requested an eye specialist referral. (Doc. 194-109). He was advised that he had been referred to an optometrist on June 9, 2022. (*Id.*).

**B. Suwanee C.I.**

On or around July 26, 2022, Plaintiff was transferred to Suwannee C.I. (Doc. 194-111 at 1–2). In sick-call requests, dated July 29, August 4, and August 23, 2022, he complained of loss of vision in his left eye and impaired vision requiring glasses. (Doc. 194-114 at 14, 17, 120, 122; Doc. 216-2 at 64; Doc. 216-3 at 6–8). On August 17, 2022, Plaintiff submitted a formal grievance that related to his vision issues, which was subsequently denied on August 26, 2022. (Doc. 194-114 at 37).

On September 23, 2022, Nurse Miranda initiated a routine optometrist referral for Plaintiff's acute visual disturbance. (Doc. 194-116 at 1; Doc. 194-117 at 157–60; Doc. 216-1 at 18–19, 21; Doc. 216-3 at 2). On October 26, 2022, Plaintiff submitted sick-call requests for multiple issues, including a red and painful right eye with a cut above it, impaired vision in his right eye, lack of care for the loss of vision in his left eye, and a need

for glasses. (Doc. 194-122 at 1, 3). On November 3, 2022, it appears Plaintiff refused a sick-call appointment addressing his concerns.[6] (Doc. 194-122 at 5; Doc. 194-123).

On January 19, 2023, Plaintiff submitted a sick-call request for untreated loss of vision in his left eye, among other complaints. (Doc. 1-3 at 8). On February 28 and March 4, 2023, Plaintiff submitted sick-call requests for loss of vision in his left eye since March 3, 2022, impaired vision in his right eye with black spots on and off, and unbearable nerve pain. (Doc. 194-127 at 1; Doc. 216-2 at 52). On March 8, 2023, among other complaints, Plaintiff reported blurred vision. (Doc. 194-127 at 3–8). However, Nurse Miranda allegedly sent him back to his dorm without an eye examination. (Doc. 1 at 24).

On March 15, 2023, Plaintiff had a telehealth neurology appointment with Dr. Sabrina Christian ("**Dr. Christian**"). (Doc. 216-3 at 66). Dr. Christian recommended diagnostic tests, a prescription for Gabapentin, a wheelchair, transfer to RMC for intensive care/hospital housing, and follow-up with a neurologist in one month. (*Id.*). The same day, Plaintiff was admitted to the infirmary for a suspected diagnosis of MS. (Doc. 194-129). He was discharged on March 17, 2023, with a diagnosis of MS. (Doc. 216-3 at 68).

On March 17, 2023, Plaintiff suffered an acute relapse of MS. (Doc. 194-130 at 2–3; Doc. 216-3 at 68, 70). As relevant, Plaintiff complained of spots or blurriness in his right eye and loss of vision in his left eye. (*Id.*). The examination revealed: loss of vision

[6] Plaintiff refused some of his appointments in August and November 2022, and in April, July, and August 2023. (Doc. 194-114 at 14, 17, 122; Doc. 194-122 at 5; Doc. 194-123; Doc. 194-135 at 1, 3–7; Doc. 194-177; Doc. 194-182; Doc. 194-183; Doc. 194-184; Doc. 194-187; Doc. 194-191; Doc. 216-3 at 7–8). Plaintiff disputes these refusals and avers that he was denied access to medical care by security and medical staff because he was not provided a wheelchair and argues that he was unable to walk to attend such appointments. (*See, e.g.*, Doc. 194-136 at 1; Doc. 194-140 at 3–6; Doc. 194-141 at 3, 5; Doc. 216-1 at 70, 85; Doc. 216-3 at 13, 111).

in the left eye; blurry vision in the right eye; 3/5 upper extremity muscle strength; 0/5 lower extremity muscle strength and decreased sensation; inability to walk; and a need for a wheelchair. (Doc. 216-3 at 70). Plaintiff was diagnosed with an acute relapse of MS. (*Id.*). Upon conferral with other physicians, Dr. Mohammad Islam ("**Dr. Islam**") transferred Plaintiff to Memorial Hospital, Jacksonville, where he remained until March 27, 2023. (Doc. 194-130 at 2–3, 5; Doc. 194-131; Doc. 194-132 at 23). Plaintiff's chart reflected that Plaintiff would be referred to an optometrist. (Doc. 216-3 at 69).

On April 3 and 6, 2023, Plaintiff filed sick-call requests complaining of multiple issues, including decreased vision, but he refused to be seen. (Doc. 194-135 at 1, 3–7). When asked to sign the refusal form, Plaintiff stated: "No[,] I will not sign a refusal, for I did not refuse sick call, I refuse to walk because I cannot walk you dumb ass f***ing cracker!" (Doc. 194-136 at 1).

On April 9, 2023, Plaintiff filed another sick-call request for vision impairment, blurred and decreased vision in his right eye, and total loss of vision in his left eye. (Doc. 194-140 at 1). Plaintiff refused to walk for his sick-call on April 19, 2023. (*Id.* at 3–6). After Plaintiff was reminded that he did not have a wheelchair pass and there was a video of him walking, Plaintiff responded: "I'll see your ass in court! You are refusing to give me medical treatment!" (*Id.* at 6). On April 15, 2023, Plaintiff submitted a sick-call for loss of vision in his left eye and decreased vision in his right eye. (Doc. 194-141 at 1). He refused to walk to his sick-call appointment on April 20, 2023, saying, "I told you I can't walk." (*Id.* at 3, 5).

On May 27, 2023, Plaintiff submitted another sick-call request with multiple complaints, including complete loss of vision in his left eye and decreased vision in his

right eye. (Doc. 194-165). On June 1, 2023, Nurse Miranda saw Plaintiff for his sick-call complaints. (Doc. 194-166 at 2). Nurse Miranda noted that an order for an optometrist referral was in place, and that it would be forwarded to the provider for further review because this was Plaintiff's third sick-call request for the same issue. (*Id.* at 3). On June 2, 2023, Nurse Miranda noted that Plaintiff complained of decreased visual acuity in his right eye and complete vision loss in his left eye.[7] (Doc. 194-168 at 1). Plaintiff's last optometry consultation occurred in 2021, and his February 15, 2023, appointment was rescheduled to June 16, 2023, due to a security issue. (Doc. 194-168 at 1). On July 12, 2023, a medical records clerk noted that Plaintiff refused the appointment with the optometrist. (Doc. 194-176). Once again, on July 16, 2023, Plaintiff submitted a sick-call request with multiple complaints, including flashes of light in his right eye, but he refused the appointment on July 18, 2023. (Doc. 194-177).

On July 19, 2023, Plaintiff's grievance for a wheelchair during out-of-cell escorts was approved. (Doc. 216-3 at 89). The same day, Plaintiff sent a written notice to Centurion that he has "been continuously deprived of care and treatment for a left[-]eye injury . . . exceeding one year" and "impaired vision in [the] right eye." (*Id.* at 105–06).

On July 25, 2023, and August 2 and 8, 2023, Plaintiff was scheduled to be seen after he submitted multiple sick call requests complaining of pain and vision loss in the left eye and decreased vision and flashes of light in the right eye, but Plaintiff refused to appear for the appointments. (Doc. 1-3 at 11–13; Doc. 194-182; Doc. 194-183; Doc. 194-187).

---

[7] Plaintiff claims Nurse Miranda told him he could live with one eye. (Doc. 1 at 24–25).

### C. Florida State Prison ("FSP")

On August 11, 2023, Plaintiff was transferred to FSP. (Doc. 194-188 at 1). He commenced this action on August 16, 2023. (*See* Doc. 1).

On August 17, 2023, Plaintiff was scheduled to be seen pursuant to a sick-call request involving multiple complaints, including decreased vision in his right eye, but, once again he refused the appointment. (Doc. 194-191). The same day, Plaintiff filed a grievance, complaining that the nurse who documented his refusal did so fraudulently to deprive him of medical care. (Doc. 216-3 at 101). Plaintiff's grievance was approved on August 23, 2023, to the extent that an incident report had been generated. (*Id.* at 102).

On September 14, 2023, Plaintiff was seen pursuant to a sick-call request for loss of vision in his left eye and decreased vision in his right eye.[8] (Doc. 194-192 at 12). Plaintiff was then referred for a visual acuity test. (*Id.*)

On December 1, 2023, Plaintiff was seen for blurred vision and Dr. Acevedo was notified. (Doc. 219-3 at 2).

On January 10, 2024, due to a security risk, Dr. Roberts could not see Plaintiff, but she recommended a referral to a retinal specialist for his complaints of loss of vision post trauma. (Doc. 219-4 at 1). That same day, after noting "subjective loss of vision [status post] trauma" in the left eye and findings of left-eye blindness, Dr. Acevedo initiated an urgent referral to a retinal specialist for Plaintiff's acute trauma: loss of vision and vision changes. (Doc. 216-1 at 22–24; Doc. 219-4 at 2–4; Doc. 223-1 at 3).

---

[8] It was noted that Plaintiff "was able to read his sick[-]call [request form] while having first right and then left eye closed." (Doc. 194-192 at 12). Plaintiff disputes this happened. (Doc. 216 at 32).

### D. Suwannee C.I.

On February 13, 2024, Plaintiff was transferred back to Suwannee C.I. (*See* Doc. 64).

On February 20, 2024, Dr. Kenneth Rappaport ("**Dr. Rappaport**"), a vitreo-retinal specialist/ophthalmologist, saw Plaintiff for an initial consultation. (Doc. 216-1 at 27; Doc. 219-5 at 1; Doc. 223-1 at 5). Dr. Rappaport's notes are largely illegible. (*See id.*).

On March 5, 2024, Nurse Miranda reviewed Dr. Rappaport's report with Plaintiff. (Doc. 216-1 at 28). It showed possible traumatic optic neuropathy in the left eye, negative for Afferent Pupillary Defect, and negative for Pallor (i.e., screening for anemia and/or nerve health). (*Id.*). Plaintiff was directed to follow-up as needed. (*Id.*).

On June 4, 2024, Dr. Acevedo saw Plaintiff for a wellness check, assessed severe physical deconditioning, and placed an order for a permanent wheelchair. (Doc. 216-3 at 72).

Thereafter, Plaintiff was transferred to multiple institutions. (*See* Doc. Nos. 97, 104, 113 (noting that Plaintiff was transferred to FSP on June 4, 2024, to Santa Rosa C.I. on June 6, 2024, and to RMC on July 11, 2024)). He was returned to Suwannee C.I. on or around July 29, 2024. On December 13, 2024, nursing staff reviewed Plaintiff's chart and noted:

> Patient [was] seen by [a] retinal specialist [on] 02/20/2024. Spoke with [the] retinal specialist as unable to read [the] charting. . . . There is no structural defect, nothing needs to [be] treated or corrected.
>
> [Assessment:] [P]atient reported left[-]eye blindness. No concerns per retinal specialist and no new reported injuries. [R]etinal specialist referral not indicated at this time.

(Doc. 219-2 at 1).

Between December 2024 and September 2025, Plaintiff was transferred to various other institutions, before transferring back to Santa Rosa C.I. on September 15, 2025. (*See* Doc. Nos. 154, 155, 167, 170, 189 (noting that Plaintiff was transferred to RMC on April 14, 2025, to Santa Rosa C.I. on April 25, 2025, to RMC on May 28, 2025, to Washington C.I. on June 17, 2025, and to Suwannee C.I. on July 9, 2025)).

On September 26, 2025, Dr. Wesley Mayes ("**Dr. Mayes**") saw Plaintiff for an optical prescription. (Doc. 216-1 at 29). Upon examination, Plaintiff's visual acuity without correction was 20/200 in the right eye, 20/NLP (no ability to perceive light) in the left eye, and 20/100 in both eyes; his peripheral visual field was restricted in both eyes; his Best-Corrected Visual Acuity was 20/40 in the right eye, 20/NLP in the left eye, and 20/40 in both eyes; and his eye pressure was normal in both eyes. (*Id.* at 30). Dr. Mayes diagnosed Plaintiff with optic neuropathy and pain in both eyes. (*Id.* at 31). Dr. Mayes noted that Plaintiff was being tested for MS and would be referred to a neurologist or neuro-ophthalmologist as soon as possible. (*Id.*). Plaintiff was "advised to wear glasses at all times for protection." (*Id.*). Dr. Mayes recommended that the next optometry follow-up occur on or about December 20, 2025. (*Id.* at 30). Plaintiff received his glasses on December 30, 2025, while at RMC. (*See* Doc. 193; Doc. 216-2 at 69).

## IV. ADDITIONAL EVIDENCE

### A. Plaintiff's Affidavits

Plaintiff submits four of his own sworn affidavits. (Doc. 216-1 at 69–71, 84–86; Doc. 216-3 at 12–14; Doc. 223-1 at 1–2). In the first affidavit, dated February 5, 2026, he avers as follows. (Doc. 216-1 at 69–71). The March 3, 2022 attack against Plaintiff resulted in "a noticeable traumatic injury to [his] left eye with agonizing pain and vision

los[s]." (*Id.* at 69). While Nurse Walden was at his cell-front, Plaintiff "personally showed" her and told her that he could not see out of his left eye and had agonizing pain. (*Id.*). Nurse Walden "recklessly ignored" Plaintiff's cries for help, never assessed his medical emergency, and left him in a "state of severe medical distress without obtaining []or rendering medical aid." (*Id.* at 69–70). Nurse Walden falsified Plaintiff's refusal of treatment, refused to document his left-eye injury, failed to notify a doctor about it, and "never provided any treatment whatsoever." (*Id.* at 70–71).

In the second affidavit, dated February 5, 2026, Plaintiff avers as follows. (*Id.* at 84–86). Nurse Putney knew that Plaintiff sustained an acute trauma to his left eye and needed urgent treatment. (*Id.* at 84). During each interaction with Nurse Putney, Plaintiff complained about his agonizing pain with vision loss, and requested pain relief and to be seen by a doctor. (*Id.* at 84–85). Nurse Putney declined Plaintiff's requests to see a doctor and knew that he could not take Meloxicam because of his allergies, which resulted in no treatment at all. (*Id.* at 85–86). At no time did Plaintiff refuse or decline any appointment or treatment related to his left-eye complaints. (*Id.* at 85).

In the third affidavit, dated February 5, 2026, Plaintiff avers as follows. (Doc. 216-3 at 12–14). Nurse Miranda knew of Plaintiff's left-eye trauma because he labeled it "as [an] acute illness" of visual disturbance on September 23, 2022. (*Id.* at 12). From September 23, 2022, through August 2023, Nurse Miranda knew that Plaintiff had not been seen by an optometrist because his referral was still pending. (*Id.*). Nurse Miranda ignored Plaintiff's need for urgent treatment and told him he can live with one eye. (*Id.*). Plaintiff never declined any appointment or treatment related to his left-eye complaints. (*Id.* at 13). Nurse Miranda and his agents denied and blocked Plaintiff's access to

treatment. (*Id.*). Nurse Miranda was personally aware of Dr. Rappaport's order for follow-up care but refused to honor it or provide pain management. (*Id.* at 14).

In the fourth affidavit, dated March 27, 2026, Plaintiff avers as follows. (Doc. 223-1 at 1–2). Plaintiff sustained left-eye vision loss, traumatic excruciating pain to his left eye with contusion, and severe noticeable swelling from the attack on March 3, 2022. (*Id.*). Nurse Walden knew about Plaintiff's injuries, but did not accurately document them. (*Id.* at 1). Plaintiff was eventually seen "approximately 2 to 3 years later and diagnosed with 'traumatic optic neuropathy.'" (*Id.*). Plaintiff's left-eye injury and blindness were not caused by another incident. (*Id.*). Plaintiff never received a single dose of Gabapentin, which was prescribed by a specialist for nerve pain, because Nurse Miranda personally discontinued the order. (*Id.* at 2).

**B. Affidavits/Declarations of Other Inmates**

*1. Robert Curry*

Plaintiff submits the March 3, 2022 sworn declaration/affidavit of Robert Curry, who was housed next to Plaintiff's cell at Union C.I. on March 3, 2022. (Doc. 216-1 at 33). Mr. Curry states, in part, that after Plaintiff was attacked in his cell, he could not see out of his left eye, and Nurse Walden ignored his medical emergency and failed to document his injuries. (*Id.* at 33–34).

*2. Blair Boyd*

Plaintiff submits the sworn declaration/affidavit of Blair Boyd, who was housed near Plaintiff's cell at Union C.I. on March 3, 2022. (*Id.* at 35). Mr. Boyd avers that after the attack on Plaintiff, Nurse Walden ignored Plaintiff's medical emergency and deprived him of medical care for his left-eye injury. (*Id.*).

*3. Jean Gerome*

Plaintiff submits the March 5, 2023 affidavit/declaration of Jean Gerome, who was housed at Suwannee C.I. in 2022–2023. (Doc. 216-3 at 95–96). Mr. Gerome states, in part, that he personally witnessed Plaintiff turn in sick-call requests on October 28, November 1, 16, and 30, 2022, and on January 19, February 20 and 28, and March 4, 2023. (*Id.*).

*4. Timothy Alan Connell*

Plaintiff submits the August 15, 2022 sworn declaration of Timothy Alan Connell, who was housed at Suwannee C.I. on or around August 10, 2022. (*Id.* at 97–99). Mr. Connell states, in part, that he has not seen or heard "any 'scuffle,' physical altercation, or verbal disturbance between security or inmates" at any time. (*Id.* at 97–98).

**C. Defendants' Discovery Responses**

Plaintiff submits Nurse Walden's unverified answers to Plaintiff's interrogatories, where she: (1) denied that Plaintiff was in an obvious, serious medical distress when she saw him at his cell on March 3, 2022; (2) stated she did "not recall any complaints of lost vision"; and (3) stated she was unable to examine Plaintiff due to his behavior on March 3, 2022. (Doc. 216-1 at 52–56). In response to Plaintiff's requests for admission, Nurse Walden denied that Plaintiff told her that he was in severe pain and could not see out of his left eye. (*Id.* at 58–61).

Plaintiff also submits Nurse Putney's responses to Plaintiff's requests for admission, where she denied knowing about Plaintiff's acute trauma to his left eye with complaints of vision loss and agonizing pain. (Doc. 216-2 at 89–92).

Additionally, Plaintiff submits Nurse Miranda's responses to Plaintiff's requests for admission, where Nurse Miranda denied being placed on notice of Plaintiff's left-eye injury and acute trauma with complaints of vision loss and agonizing pain. (Doc. 216-3 at 23–26).

### D. Miscellaneous Records

Plaintiff also submits copies or excepts of: (1) the FDOC's Revised Sick-Call Procedures, effective April 2017, (Doc. 216-2 at 72); (2) the FDOC's Health Services Handbook, (*id.* at 78–86; Doc. 216-3 at 126–34); (3) the Florida Administrative Code, (Doc. 216-3 at 28–37); (4) Procedure No. 208.039, titled Employee Counseling and Discipline, (*id.* at 38–55); and (5) Procedure No. 403.006, titled Sick Call Process and Emergencies, effective September 14, 2023, (Doc. 216-1 at 63–67; Doc. 216-2 at 73–77).

## V. DISCUSSION

### A. Deliberate Indifference

#### *1. Standard*

The Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement," including adequate medical care, and "must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). As it relates to medical care, "the Supreme Court has held that prison officials violate the bar on cruel and unusual punishments when they display 'deliberate indifference to serious medical needs of prisoners.'" *Keohane v. Fla. Dep't of Corrs. Sec'y*, 952 F.3d 1257, 1265 (11th Cir. 2020) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Deliberate

indifference to a prisoner's serious medical need constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment. *Estelle*, 429 U.S. at 104. Importantly, however, not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. *Id*. at 105.

"To prevail on a claim of deliberate indifference, [a] plaintiff[] 'must satisfy both an objective and a subjective inquiry,' *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003), and must establish a 'necessary causal link' between the challenged conduct and [his] injuries, *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019)." *Stalley v. Cumbie*, 124 F.4th 1273, 1283 (11th Cir. 2024). "The objective inquiry turns on whether the plaintiff experienced an 'objectively serious medical need.'" *Id.* (quoting *Farrow*, 320 F.3d at 1243). A serious medical need is one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Keohane*, 952 F.3d at 1266 (quotations omitted). "In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009). In either case, "the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (internal citations and quotation marks omitted).

> The subjective inquiry, on the other hand, turns on whether the "prison official acted with an attitude of 'deliberate indifference' to [the] serious medical need." *Farrow*, 320 F.3d at 1243. A prison official acted with deliberate indifference if he (1) had subjective knowledge of a risk of serious harm,[9] (2) disregarded that risk, and (3) engaged in conduct that amounts

[9] "Whether a [defendant] had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a [defendant] knew of a

> to subjective recklessness. *See Farmer*, 511 U.S. at 836–40. As [the Eleventh Circuit] recently reiterated, this third prong will be satisfied only if the plaintiff shows "that the defendant actually knew that his conduct—his own acts or omissions—put the plaintiff at substantial risk of serious harm." *Wade v. McDade*, 106 F.4th 1251, 1253 (11th Cir. 2024) (en banc). Even when a defendant has subjective knowledge of a serious risk, "a defendant who 'responds reasonably' to [such] a risk . . . 'cannot be found liable' under the Eighth Amendment." *Id.* at 1255 (quoting *Farmer*, 511 U.S. at 845).

*Stalley*, 124 F.4th at 1283–84 (internal citations modified); *see also Wade*, 106 F.4th at 1257–58, 1262 (stating that under the criminal-recklessness standard, the inmate must "prove that the defendant prison official *actually* knew of a substantial risk of serious harm, not just that he *should have known*" and that the defendant official was subjectively aware that his own conduct—[] his own actions or inactions—put the plaintiff at substantial risk of serious harm" (emphasis in original)).[10]

Importantly, medical treatment gives rise to a constitutional violation "only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Hoffer v. Sec'y, Fla. Dep't of Corrs.*, 973 F.3d 1263, 1271 (11th Cir. 2020) (quotations omitted). "As applied in the prison context, the deliberate-indifference standard sets an appropriately high bar." *Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir 2020). A prisoner seeking to bring a deliberate indifference claim under § 1983 "has a steep hill to climb," *Keohane*, 952 F.3d at 1266, because when prison medical providers provide treatment and "the dispute is over the adequacy of th[at] treatment, federal courts are generally reluctant to second guess medical judgments and

---

substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (internal citations omitted).

[10] To the extent prior Eleventh Circuit deliberate indifference cases are not inconsistent with *Wade*, "they should continue to be cited as binding precedent." *Wade*, 106 F.4th at 1265 (Jordan, J., concurring).

to constitutionalize claims that sound in tort law," *Hamm*, 774 F.2d at 1575 (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (1st Cir. 1981)). In other words, "incidents of negligence or malpractice [are] not . . . constitutional violations." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991). Similarly, "whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (quoting *Estelle*, 429 U.S. at 107); *see also Harris*, 941 F.2d at 1505 ("[A] simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [does not] support a claim of cruel and unusual punishment.").

The following conduct may constitute deliberate indifference: (1) knowing an inmate needs medical care, but intentionally refusing to provide that care, *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985); (2) providing care that is "so cursory as to amount to no treatment at all," *id.*; or (3) unnecessarily delaying treatment for a known serious injury, *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) ("[A]n unexplained delay of hours in treating a serious injury states a *prima facie* case of deliberate indifference."). "The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay. A few hours' delay in receiving medical care for emergency needs such as broken bones and bleeding cuts may constitute deliberate indifference." *Harris v. Coweta Cnty.*, 21 F.3d 388, 393–94 (11th Cir. 1994) (citing *Brown*, 894 F.2d at 1533). For other "injuries that are of a lesser degree of immediacy than broken bones and bleeding cuts, but that are

obvious serious medical needs," a delay of "several weeks [is] too long to fail to properly respond to the medical need." *Harris*, 21 F.3d at 394 (citing *Carswell v. Bay Cnty.*, 854 F.2d 454 (11th Cir.1988). "When a plaintiff alleges that delay in medical treatment shows deliberate indifference, he 'must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.'" *Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010)[11] (citing *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187–88 (11th Cir.1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 n. 9 (2002)). "Self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records." *Whitehead*, 403 F. App'x at 403 (citing *Bennett v. Parker*, 898 F.2d 1530 (11th Cir.1990)).

*2. Analysis*

Defendants argue "the evidence does not support that Plaintiff suffered from a serious medical need at the time of [their respective] interactions." (Doc. 194 at 32). They state:

> Plaintiff was involved in two use of force incidents on March 3, 202[2], [during] both of which he sustained minor injuries, which were promptly addressed and treated. Plaintiff then underwent extensive diagnostic treatment and medical examinations which demonstrated no serious or permanent injuries. Accordingly, at the time of each of the respective Defendants' interactions, Plaintiff was not suffering from a need diagnosed by a physician or "so obvious that even a lay person would easily recognize the necessity for a doctor's attention."

(*Id.* (internal citations omitted)).

[11] Any unpublished decisions cited in this Order are deemed persuasive authority on the relevant point of law. *See McNamara v. GEICO*, 30 F.4th 1055, 1061 (11th Cir. 2022).

Plaintiff responds that he suffered blunt-force trauma to his left eye during the first use-of-force incident on March 3, 2022, which resulted in instant vision loss and agonizing pain. (*See, e.g.*, Doc. Nos. 1, 216). He asserts that despite multiple documented complaints and sick-call requests related to his left eye, Defendants delayed and denied medical care for his injury. (*See id.*). According to the medical records, Plaintiff was not seen by an ophthalmologist until February 20, 2024, and by an optometrist until September 26, 2025, and he did not receive his glasses until December 30, 2025, all of which occurred after the commencement of this action. (Doc. 216-1 at 27, 29–31; Doc. 216-2 at 69; Doc. 219-5 at 1; Doc. 223-1 at 5).

The Court finds that Defendants have not met their burden to show the absence of a genuine issue of material fact as to whether Plaintiff experienced an objectively serious medical need at the time of his interactions with Defendants. There are multiple sick-call requests and medical records referring to Plaintiff's left-eye injury on March 3, 2022. Nevertheless, Defendants seemingly rely on Nurse Walden's records from that day, which show that she was unable to complete her evaluation due to Plaintiff's behavior, and she only documented Plaintiff's busted lip and blood on his spit shield. (Doc. 194-2 at 1; Doc. 194-3 at 1; Doc. 194-4 at 1; Doc. 216-1 at 37–38). Plaintiff avers that Nurse Walden failed to document his swollen left eye, and complaints of vision loss and agonizing pain, ignored his medical emergency, and falsely stated that Plaintiff refused medical services on March 3, 2022. (Doc. 1 at 8; Doc. 194-3 at 2; Doc. 194-5; Doc. 216-1 at 39, 49, 69–70; Doc. 223-1 at 1). In addition to presenting his own affidavits, Plaintiff supports his averments with the affidavits of Mr. Curry and Mr. Boyd. Mr. Curry, who was housed next to Plaintiff's cell on March 3, 2022, avers that he witnessed Nurse

Walden leaving the cell-front without documenting Plaintiff's left-eye injury and ignored Plaintiff's medical emergency. (Doc. 216-1 at 33–34). Similarly, Mr. Boyd, who was housed near Plaintiff's cell on March 3, 2022, avers that Nurse Walden ignored Plaintiff's medical emergency after the use-of-force incident and deprived Plaintiff of medical care for his left-eye injury. (*Id.* at 35).

Defendants do not submit any evidence to refute these averments. Instead, they rely on the contemporaneous medical records documenting their interactions with Plaintiff. The current medical record[12] before the Court reflects Plaintiff's consistent complaints of a left-eye injury with vision loss and agonizing pain since the March 3, 2022 incident. Although Nurse Walden did not document any eye injury on March 3, 2022, Nurse Noles, who saw Plaintiff that same day, documented "noted contusion" on Plaintiff's left upper orbit without discoloration, administered eye wash, and recommended cool compresses to the left eye. (Doc. 194-2 at 1; Doc. 194-3 at 1; Doc. 194-4 at 1; Doc. 194-6 at 1; Doc. 216-1 at 37–38). Then, on March 5, 2022, an examination showed that Plaintiff's left eye was swollen/bruised with red cornea; eye wash was applied; and Plaintiff was instructed to return to the clinic, if necessary. (Doc. 194-7 at 1, 3; Doc. 194-8 at 1). Plaintiff continued to complain of swelling, sensitivity to light and touch, loss of vision, and agonizing pain in his left eye on March 5, 27, and 31, April 6, 10, and 28, June 1, 9, 22, and 30, July 12, 18, and 29, August 4 and 23, September 23, and October 26, 2022; January 19, February 28, March 4 and 17, April 3, 6, 9, and 15, May 27, June 1

[12] Plaintiff's allegations of additional medical visits and his submission of additional medical records after the filing of Defendants' Motion raise questions about the completeness of the current record. (*See generally* Doc. Nos. 216-1, 216-2, 216-3, 223-1).

and 2, July 19, 21, 28, and 29, and August 3 and 8, 2023; as well as after he filed this action. (Doc. 1-3 at 8, 11–13; Doc. 194-7 at 1, 3; Doc. 194-8 at 1; Doc. 194-13; Doc. 194-24 at 1–3; Doc. 194-26; Doc. 194-38 at 4; Doc. 194-40; Doc. 194-86; Doc. 194-95; Doc. 194-105 at 1, 3; Doc. 194-106 at 2, 4, 7; Doc. 194-107; Doc. 194-108 at 2–3; Doc. 194-109; Doc. 194-114; Doc. 194-116 at 1; Doc. 194-117 at 157–60; Doc. 194-122; Doc. 194-127; Doc. 194-130 at 2, 5; Doc. 194-135 at 1, 3–7; Doc. 194-140 at 1; Doc. 194-141 at 1; Doc. 194-165; Doc. 194-166 at 2–3; Doc. 194-168 at 1; Doc. 194-182; Doc. 194-187; Doc. 216-1 at 7, 9, 14, 16, 18–19, 22–24, 27–30; Doc. 216-2 at 52, 64; Doc. 216-3 at 2, 6–8, 69–70, 105–06; Doc. 219-2 at 1; Doc. 219-4 at 2–4; Doc. 219-5 at 1; Doc. 223-1 at 3, 5).

Notably, at the pleading stage, Nurse Walden, Nurse Putney, and Nurse Miranda did not seem to dispute that Plaintiff experienced an objectively serious medical need at the time of their interactions. Having received Dr. Rappaport's February 20, 2024 report and Dr. Mayes's September 26, 2025 report, Defendants try to disregard Plaintiff's left-eye injury. (*See* Doc. 194 at 32). In their Reply, Defendants argue that Plaintiff *never* suffered from an objectively serious medical need related to his left eye, Plaintiff was *never* diagnosed with traumatic optic neuropathy or left-eye vision loss, and Plaintiff's eye condition was not caused by the incident on March 3, 2022.[13] (*See* Doc. 219 at 5). Defendants' assertions do not find credible support in the record.

Based on the current record and drawing all reasonable inferences in favor of Plaintiff as the non-moving party, the Court finds that a jury could reasonably conclude

[13] Defendants seem to imply that Plaintiff's left-eye injury could have resulted from a subsequent use-of-force incident on December 1, 2023, when Plaintiff complained of blurred vision. (*See* Doc. 219 at 5).

that Plaintiff experienced an objectively serious medical need at the time of his interactions with Defendants. Plaintiff's traumatic left-eye injury was visible, reportedly painful, and subsequently diagnosed as neuromyelitis optica on April 6, 2022, possible traumatic optic neuropathy on March 5, 2024, and optic neuropathy and eye pain on September 26, 2025. (Doc. 194-24 at 1–3; Doc. 216-1 at 28, 31). As noted previously, "[e]vidence of recent traumatic injury . . . has generally been sufficient to demonstrate a serious medical need." *See Brown*, 894 F.2d at 1538 n.4 (collecting cases); *see also Fernandez v. Metro Dade Police Dep't*, 397 F. App'x 507, 513 n.7 (11th Cir. 2010) ("In determining whether Plaintiff had an objectively serious medical need, [at summary judgment, the court] may consider the medical evaluation and treatment he subsequently received."); *Aldridge v. Montgomery*, 753 F.2d 970, 973 (11th Cir. 1985) (discussing evidence of a plaintiff's subsequent medical treatment as part of the serious medical need analysis).

Before turning to the subjective recklessness inquiry, the Court makes the following general observations. According to the record, Nurse Walden participated in Plaintiff's care between March 3 and June 30, 2022, but she mentioned Plaintiff's eye complaints only on June 30, 2022. Nurse Putney participated in Plaintiff's care between March 3 and July 21, 2022, but she mentioned or addressed Plaintiff's eye complaints only on March 31, April 28, June 9 and 30, 2022. Nurse Miranda was involved in Plaintiff's care on multiple occasions between July 26, 2022, and March 5, 2024, but he mentioned or addressed Plaintiff's eye complaints only on September 23, 2022, March 8, 15, and 17, June 1 and 2, 2023, and March 5, 2024.

Turning to Nurse Walden, the Court finds there are genuine issues of material fact as to when she became aware of Plaintiff's left-eye injury and whether she responded reasonably to such injury. Drawing all reasonable inferences in Plaintiff's favor, a jury could reasonably conclude that Nurse Walden deliberately failed to document Plaintiff's swollen left eye and complaints of vision loss and agonizing pain, ignored his medical emergency, and failed to provide or facilitate any treatment for Plaintiff's left-eye injury on March 3, 2022, and beyond.[14] (Doc. 1 at 8; Doc. 194-3 at 2; Doc. 194-5; Doc. 216-1 at 33–35, 39, 49, 69–70; Doc. 223-1 at 1). As Nurse Walden argues that Plaintiff did not suffer a left-eye injury on March 3, 2022, she does not address whether she responded reasonably to such injury. Nevertheless, even if Nurse Walden did not become aware of Plaintiff's left-eye injury on March 3, 2022, a jury could reasonably conclude that she became aware of Plaintiff's complaints of unbearable pain in his left eye with loss of vision when she saw Plaintiff on June 30, 2022, in response to his June 22, 2022 sick-call request. (Doc. 194-106 at 2, 4, 7). On June 30, 2022, Nurse Walden documented Plaintiff's complaints of unbearable pain in his left eye with loss of vision since March 3, 2022, and his complaint that these issues were not being addressed by the proper medical professionals. (*Id.* at 7). Also, by virtue of the medical record before her, a jury could reasonably find that as of June 30, 2022, Nurse Walden was aware of Plaintiff's pending optometrist referrals from March 31, April 28, and June 9, 2022, but failed to provide or facilitate any treatment for Plaintiff's left-eye injury, except to advise him to keep all future call-outs. (*Id.*).

[14] It is unclear whether Nurse Walden saw Plaintiff on April 20 and 21, 2022. (*See* Doc. 1 at 13–14).

Considering the evidence and drawing all reasonable inferences in Plaintiff's favor, a jury could reasonably find that Nurse Walden was aware that her own conduct placed Plaintiff at a substantial risk of serious harm, such as worsening vision, permanent vision impairment, and/or unbearable eye pain.[15] Indeed, as shown by Plaintiff's subsequent diagnoses of neuromyelitis optica, possible traumatic optic neuropathy, optic neuropathy, and eye pain, this risk was not merely hypothetical. (Doc. 194-24 at 1–3; Doc. 216-1 at 28, 31). While Plaintiff's left-eye condition may or may not have been caused or aggravated by Nurse Walden's response or lack of response to his traumatic injury, the issues of subjective recklessness and causation cannot be resolved on the current record. Thus, Defendants' Motion will be denied as to Nurse Walden.

Similarly, as to Nurse Putney, the Court finds there are genuine issues of material fact as to whether she acted with subjective recklessness towards Plaintiff's left-eye injury. Nurse Putney became aware of Plaintiff's left-eye complaints on March 31, 2022, when she evaluated his eyes and initiated a "routine" optometrist referral for his "acute trauma." (Doc. 194-22 at 6; Doc. 216-1 at 7, 9). The purpose of the referral was to evaluate and recommend treatment for Plaintiff's vision changes after an altercation. (*Id.*). Plaintiff continued to complain of worsening vision to nursing staff and was diagnosed with MS and neuromyelitis optica by Dr. Mohsen on April 6, 2022. (Doc. 194-24 at 1–3; Doc. 194-26). At his follow-up appointment on April 28, 2022, Plaintiff

[15] The Court emphasizes that it does not find that Nurse Walden was deliberately indifferent to Plaintiff's left-eye injury, but only that genuine issues of material fact preclude summary judgment in Nurse Walden's favor. Whether Nurse Walden knew that she was providing grossly inadequate medical care may require an explanation and understanding of the applicable standard of care, which may be provided through expert medical testimony.

continued to complain of vision changes, and Nurse Putney noted that an optometrist referral had been submitted. (*See* Doc. 194-38 at 4; Doc. 216-1 at 87). At the follow-up on June 9, 2022, Plaintiff continued to complain of vision changes, and Nurse Putney submitted another "routine" optometrist referral for Plaintiff's "chronic" condition to evaluate and recommend treatment for Plaintiff's vision changes. (Doc. 194-95 at 2; Doc. 194-96 at 5). On June 30, 2022, Nurse Putney saw Plaintiff for multiple complaints, including the pending optometrist referral. (Doc. 194-105 at 1, 3).

Based on this record, a jury could reasonably conclude that between March 31 and June 30, 2022, Nurse Putney became aware of Plaintiff's left-eye complaints after an altercation.[16] Further, considering the continuing nature of Plaintiff's complaints, a jury could reasonably conclude that Nurse Putney was aware that her own conduct placed Plaintiff at a substantial risk of serious harm to the extent she denied or delayed Plaintiff's treatment by an appropriate medical professional.[17] The question of whether Nurse Putney responded reasonably to Plaintiff's left-eye complaints—by submitting routine

[16] In her responses to Plaintiff's requests for admission, Nurse Putney denied knowing of Plaintiff's acute trauma to his left eye with complaints of vision loss and agonizing pain. (Doc. 216-2 at 89–92). Nurse Putney's denial is inconsistent with the medical record.

[17] *See Mandel v. Doe*, 888 F.2d 783, 790 (11th Cir. 1989) (finding that a physician's assistant "could not have been expected to diagnose correctly every medical problem brought to his attention," but "his persistent refusal" to order diagnostic tests or refer the inmate "to a doctor or a hospital for more experienced and knowledgeable treatment, coupled with his utter lack of concern for the well-being of an inmate with whose case he had been entrusted, constitutes precisely the deliberate indifference not tolerated by the Constitution"); *Lucas v. Turn Key Health Clinic, LLC*, 58 F.4th 1127, 1139 (10th Cir. 2023) (explaining that subjective intent may turn not on "whether the prison official provided *some* care but rather whether they fulfilled their sole obligation to refer or otherwise afford access to medical personnel capable of evaluating a patient's treatment needs when such an obligation arises" (emphasis in original)).

optometrist referrals for his "acute" and "chronic" vision changes, which never materialized while Plaintiff was under her care—would be properly decided by the fact-finder upon consideration of the applicable standard of care, which may require specialized knowledge. As the record shows, Plaintiff was seen by an ophthalmologist in February 2024, only after Dr. Acevedo submitted an "urgent" referral in January 2024, for evaluation of Plaintiff's "acute" trauma. (Doc. 216-1 at 22–24, 27; Doc. 219-4 at 2–4; Doc. 219-5; Doc. 223-1 at 3, 5).

While Defendants argue that Nurse Putney appropriately addressed Plaintiff's medical complaints, they do not explain how Nurse Putney addressed Plaintiff's *vision* complaints, other than to point to the contemporaneous medical records. Further, as stated previously, "this case does not involve a claim that different treatment should have been provided, which is tantamount to a medical judgment call, but that the treatment provided was grossly inadequate, amounting to no treatment at all." (Doc. 106 at 16 (quoting *McElligot v. Foley*, 182 F.3d 1248, 1259 (11th Cir. 1999))). Additionally, to the extent Nurse Putney argues that Plaintiff has not shown a causal connection between his left-eye condition and Nurse Putney's conduct, the Court is unable to decide the issue of causation on the current record. Considering Plaintiff's neurological conditions, whether preexisting or concurrent to his traumatic left-eye injury, it is unclear to what extent Nurse Putney's conduct impacted Plaintiff's left-eye condition. Thus, Defendants' Motion will be denied as to Nurse Putney.

Next, turning to Nurse Miranda, the Court finds that there are genuine issues of material fact as to whether he acted with subjective recklessness when he became aware of Plaintiff's left-eye complaints. Based on the record, a jury could reasonably conclude

that Nurse Miranda became aware of Plaintiff's vision complaints on September 23, 2022, when he initiated a "routine" optometrist referral for Plaintiff's "acute" illness of visual disturbance. (Doc. 194-116 at 1; Doc. 194-117 at 157–60; Doc. 216-1 at 18–19, 21; Doc. 216-3 at 2). Also, considering the continuing nature of Plaintiff's complaints, a jury could reasonably conclude that Nurse Miranda was aware that his own conduct placed Plaintiff at a substantial risk of serious harm to his left eye. Plaintiff continued to verbalize his complaints of vision disturbance to Nurse Miranda through June 2, 2023. On March 8, 2023, Nurse Miranda saw Plaintiff for multiple complaints, including blurred vision, but did not address his vision complaints. (Doc. 1 at 24; Doc. 194-127 at 3–8). On March 15, 2023, Plaintiff was admitted to the infirmary for a suspected diagnosis of MS and multiple other complaints, including spots in his vision. (Doc. 194-129). Upon discharge on March 17, 2023, Plaintiff suffered an acute relapse of MS and continued to complain of vision loss in his left eye and spots or blurriness in his right eye. (Doc. 194-130 at 2, 5). The examination confirmed those complaints, and it was noted that Plaintiff would be referred to an optometrist. (Doc. 194-130 at 2, 5; Doc. 216-3 at 69–70). During a review of records on March 29, 2023, Nurse Miranda recommended an outpatient neurology appointment. (Doc. 194-132 at 1). During a sick-call appointment on June 1, 2023, Nurse Miranda noted that an order for an optometrist referral was in place and would be forwarded to the provider for further review because it was Plaintiff's third sick-call request for the same issue. (Doc. 194-166 at 3). On June 2, 2023, Nurse Miranda noted that Plaintiff complained of complete loss of vision in his left eye and decreased visual acuity in his right eye. (Doc. 194-168 at 1). Plaintiff avers that Nurse Miranda told him that day that he could live with one eye. (Doc. 1 at 24–25; Doc. 216-3 at 12). Nurse Miranda's records

reflect that Plaintiff's optometrist appointment had to be rescheduled from February 15, 2023, to June 16, 2023, due to a security issue, but there is no record of Plaintiff being seen by an optometrist on June 16, 2023. (Doc. 194-168 at 1). On July 12, 2023, a medical records clerk noted that Plaintiff was referred to an optometrist, but he refused the appointment.[18] (Doc. 194-176). Plaintiff continued to alert medical staff of his vision complaints on July 16, 19, 25, 28, and 29, August 3, 8, and 17, September 14, and December 1, 2023, until Dr. Acevedo ordered an "urgent" ophthalmologist referral on January 10, 2024, and Plaintiff was seen by Dr. Rappaport on February 20, 2024. (Doc. 1-3 at 11–13; Doc. 194-177; Doc. 194-182; Doc. 194-187; Doc. 194-191; Doc. 194-192 at 12; Doc. 216-1 at 22–24, 27; Doc. 216-3 at 105–06, 108–09; Doc. 219-3 at 2; Doc. 219-4 at 2–4; Doc. 219-5 at 1; Doc. 223-1 at 3, 5). On March 5, 2024, Nurse Miranda saw Plaintiff for a review of Dr. Rappaport's report, which showed possible traumatic optic neuropathy in his left eye and directed follow-up as needed. (Doc. 216-1 at 28). This is the last time that Nurse Miranda saw Plaintiff according to the records before the Court.

[18] Although the record reflects that Plaintiff refused some of his appointments in August and November 2022, and in April, July, and August 2023, (*see* Doc. 194-114 at 14, 17, 122; Doc. 194-122 at 5; Doc. 194-123; Doc. 194-135 at 1, 3–7; Doc. 194-177; Doc. 194-182; Doc. 194-183; Doc. 194-184; Doc. 194-187; Doc. 194-191; Doc. 216-3 at 7–8), Plaintiff disputes these refusals and avers that he was denied access to medical care by security and medical staff, (*see, e.g.*, Doc. 216-1 at 70, 85; Doc. 216-3 at 13, 111). As set forth in the factual background, Plaintiff was found to need a wheelchair at various times while the use of one was denied on other occasions. Plaintiff maintained that he was unable to walk and that the failure to provide a wheelchair to transport him to appointments was the reason he failed to attend, not because he refused to attend. (*See, e.g.*, Doc. 194-10 at 3–4; Doc. 194-24 at 1–3; Doc. 194-31; Doc. 194-105 at 3; Doc. 194-132 at 23; Doc. 194-138 at 4; Doc. 194-158; Doc. 216-1 at 17; Doc. 216-3 at 10, 59–63, 65–66, 70–73, 82–83, 89, 122). Based on the foregoing, a genuine issue of material fact exists as to whether Plaintiff refused to walk or was unable to walk during his out-of-cell escorts.

From June 2024, to April 2026, Plaintiff was transferred fifteen times from one correctional institution to another. On December 13, 2024, nursing staff at Suwannee C.I. reviewed Dr. Rappaport's report, noting that Plaintiff reported left-eye blindness, but there were no structural defects, concerns, or new injuries. (Doc. 219-2 at 1). On September 26, 2025, when Plaintiff saw Dr. Mayes for an optical prescription, he was noted to have no ability to perceive light in his left eye. (Doc. 216-1 at 29–30). Dr. Mayes diagnosed Plaintiff with optic neuropathy and pain in both eyes and noted that Plaintiff would be referred to a neurologist or neuro-ophthalmologist as soon as possible. (*Id.* at 31). Dr. Mayes recommended that Plaintiff's next optometry follow-up occur on or about December 20, 2025, and that Plaintiff "wear glasses at all times for protection." (*Id.*). Plaintiff received his glasses on December 30, 2025. (Doc. 216-2 at 69).

On this record, a jury could reasonably find that Nurse Miranda was deliberately indifferent to Plaintiff's continued complaints of visual disturbance and complete loss of vision in his left eye. While Nurse Miranda submitted an optometrist referral on September 23, 2022, and noted that the referral would be forwarded to the provider on or around June 1, 2023, Plaintiff was not seen by an eye doctor until February 2024, and it was only after a different provider (Dr. Acevedo) at a different institution (FSP) submitted an "urgent" ophthalmologist referral for evaluation of Plaintiff's "acute" eye trauma. (Doc. 216-1 at 22–24, 27; Doc. 219-4 at 2–4; Doc. 219-5; Doc. 223-1 at 3, 5). Based on the foregoing, a jury could reasonably conclude that Nurse Miranda did not respond reasonably to Plaintiff's known vision complaints. Again, the Court cannot decide the issue of causation on the current record, considering the complexity of Plaintiff's eye

diagnoses and his other neurological conditions. Thus, Defendants' Motion will also be denied as to Nurse Miranda.

In sum, the Court will deny Defendants' Motion as to Plaintiff's deliberate indifference claims. Further, the Court will *sua sponte* refer this case to the Jacksonville Division Civil Pro Bono Appointment Program. Although a plaintiff in a civil case does not have a constitutional right to counsel, *Bass v. Perrin*, 170 F.3d 1312, 1320 (11th Cir. 1999), the Court finds that counsel should be appointed to represent Plaintiff at this time, considering the factual and legal issues in this case. Plaintiff is advised that courts are not authorized "to make coercive appointments of counsel." *Mallard v. U.S. Dist. Ct. for S. Dist. of Iowa*, 490 U.S. 296, 310 (1989). As such, the Court cannot compel an attorney to take a case for free. *See* 28 U.S.C. § 1915(e)(1) ("The court may request an attorney to represent any person unable to afford counsel." (emphasis added)). Therefore, if an attorney has not been secured after 90 days, or if Plaintiff advises the Court that he desires to proceed without a lawyer, the Court will require him to continue the prosecution of this case on his own.

**B. Negligence**

As to Plaintiff's medical negligence claims, Defendants argue they are entitled to summary judgment because Plaintiff has failed to proffer medical expert testimony.[19] As Defendants note, under Florida law, "the standard of care in medical malpractice cases must [generally] be determined by consideration of expert testimony." *Cagle v. United*

[19] The Court previously declined to dismiss Plaintiff's medical negligence claims for failure to submit a verified, written medical expert opinion because Defendants waived this requirement when they failed to timely provide copies of Plaintiff's medical records. (*See* Doc. 106 at 22–23).

*States*, No. 3:15-CV-0350-J, 2017 WL 6368249, at *3 (M.D. Fla. Aug. 3, 2017). "In fact, expert medical testimony is required in all circumstances save those 'where only the exercise of common sense and ordinary judgment are required . . . .'" *Id.* (quoting *Stepien v. Bay Mem'l Med. Ctr.*, 397 So. 2d 333, 334 (Fla. 1st DCA 1981)); *see also Torres v. Sullivan*, 903 So. 2d 1064, 1067–68 (Fla. 2d DCA 2005). Accordingly, because this case falls outside the narrow exception, if Plaintiff cannot present a proper medical expert to testify, Defendants would be entitled to judgment on the claim. *See Williams v. Leesburg Reg'l Med. Ctr., Inc.*, 430 So. 3d 961, 966, 970 (Fla. 5th DCA 2026) (holding that the trial court did not err in excluding all of the plaintiff's expert witness and, accordingly, granting summary judgment in favor of the defendant).

Nevertheless, having found that counsel should be appointed to represent Plaintiff and noting that Plaintiff had limited means and ability to engage the necessary expert thus far in this proceeding, the Court will allow the claim to proceed at this juncture to give Plaintiff and any counsel appointed on his behalf an opportunity to obtain the requisite expert testimony. *See Robinson v. United States*, 462 F. App'x 885, 887 (11th Cir. 2012); *Steele v. Shah*, 87 F.3d 1266, 1271 (11th Cir. 1996). Therefore, Defendants' Motion will be denied without prejudice at this juncture. Defendants, however, may reassert this argument if appropriate after the appointment of counsel.

**C. Punitive Damages**

Previously, when ruling on Defendants' motions to dismiss, the Court declined to strike Plaintiff's request for punitive damages. (*See id.* at 23–24). Once again, Defendants argue that Plaintiff is not entitled to punitive damages because the record does not support a deliberate indifference claim. Having determined that Defendants are

not entitled to summary judgment on Plaintiff's deliberate indifference claims, the Court again rejects Defendants' argument about the punitive damages request.

## VI. CONCLUSION

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendants' Amended Motion for Summary Judgment (Doc. 194) is **DENIED without prejudice** as to Plaintiff's negligence claims and **DENIED** in all other respects.
2. The Court **refers** this case to the Jacksonville Division Civil Pro Bono Appointment Program so that the designated deputy clerk of this Court may seek counsel to represent Plaintiff. If counsel is secured, the Court will enter a separate order specifying the appointment. The process of finding counsel may be lengthy; therefore, the parties are encouraged to discuss the possibility of settlement and immediately notify the Court if their efforts are successful.
3. Until counsel is appointed, this case is **STAYED**. Upon counsel's filing a notice of appearance, the stay will be lifted, and the case will be reopened.
4. The Clerk is directed to administratively close this case.

**DONE AND ORDERED** in Jacksonville, Florida on July 21, 2026.

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Jax-11

c: Marvin Pace, #B02617
Counsel of Record